Craig M. White (Admitted *Pro Hac Vice*)
Brent R. Austin (SBN 141938)
Chung-Han Lee (SBN 231950)
WILDMAN, HARROLD, ALLEN & DIXON, LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile: (312) 201-2555
E-mail: white@wildman.com
E-mail: austin@wildman.com
E-mail: chunglee@wildman.com

Jeffrey L. Fillerup (SBN 120543)
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
Rincon Center II, 121 Spear Street, Suite 200
San Francisco, California 94105-1582
Telephone: (415) 356-4600
Facsimile: (415) 356-4610
E-mail: jfillerup@luce.com

Attorneys for Defendant MBLOX, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| RUSSELL BRADBERRY, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiff,<br><br>vs.<br><br>MBLOX, INC., a Delaware corporation,<br><br>    Defendant. | Case No. C-07-5298 (CW)<br><br>**DECLARATION OF ROB MALCOLM IN SUPPORT OF DEFENDANT MBLOX, INC.'S MEMORANDUM IN OPPOSITION TO MOTION FOR REMAND**<br><br>Judge:    The Honorable Claudia Wilken<br>Date:     December 13, 2007<br>Time:     2:00 p.m.<br>Courtroom: 2, 4th Floor |

## DECLARATION OF ROB MALCOLM

I, ROB MALCOLM, declare as follows:

1. I am the Vice President for Solutions for defendant MBLOX, INC. (hereinafter "mBlox"), and I have served in this position since 2006. In that capacity, I am responsible for all

1

technical engineering, architecture planning, platform and carrier integration, software engineering, development and quality assurance. I have overall responsibility for the entire mBlox technical architecture evolution and drives the expansion of the Global Mobile Transaction Network and other platform design considerations as the business expands. I have had extensive experience in the wireless industry.

2.      I submit this Declaration in support of Defendant mBlox's Memorandum in Opposition to Plaintiff's Motion for Remand. I have personal knowledge of the facts set forth below, and if called as a witness, I could and would competently testify to the matters set forth in this Declaration. Where indicated, the facts and figures are estimates provided by leading wireless industry sources that are not within the control of mBlox but are considered reasonably reliable sources for data pertaining to the wireless industry. Similarly, where indicated, some of the facts and figures are matters of opinion based on my extensive experience in the wireless industry.

3.      I have reviewed the Complaint in the case entitled *Bradberry v. mBlox, Inc.*, Case No. C-07-5298 (PJH), and I am aware of the allegations contained in the Complaint. I understand that Plaintiffs are attempting in this action to certify a class consisting of all wireless telephone subscribers in the nation who were charged by mBlox for mobile content services, and in particular "Premium SMS Content", not authorized by the existing owner of the telephone number, but, rather, if at all, by a prior owner or user of the number, as a result of the wireless carriers "recycling" of telephone numbers.

4.      mBlox is the world's largest mobile transaction network specializing in providing operator connectivity and mobile billing capabilities to businesses around the globe. mBlox serves as the intermediary between businesses (or content providers) and mobile operators ( or wireless carriers) managing the delivery and billing of mobile content and mobile services.

5.      mBlox has been in the United States market for Premium SMS Content since June, 2003, and mBlox currently has approximately one-third of the market share in the United States for the market serving as the intermediary between businesses and mobile operators managing the delivery and billing of mobile content and mobile services.

6.      Telephia is an independent research company that is one of the leading providers of syndicated consumer research to the telecommunications mobile media markets. Similarly, the Yankee

DECLARATION OF ROB MALCOLM

1    Group is an independent technology research and consulting firm that provides data and research

2    relating to the pace of technology change and its effects on networks, consumers and enterprises.  In

3    preparing my analysis set forth below, I have relied, in part, on data provided by Telephia and the

4    Yankee Group.

5            7.      According to Telephia, there are currently approximately 237 million subscribers to

6    wireless telephone service in the United States.

7            8.      According to Telephia, there is a 7.7% penetration of the U.S. wireless market for

8    Premium SMS Content (which total approximately $1 billion in annual revenues).  In other words,

9    approximately 7.7% of the 237 million subscribers to wireless telephone services today in the United

10   States enroll in Premium SMS Content.

11           9.      According to the Yankee Group, approximately 44 million subscribers each year

12   disconnect or terminate their wireless telephone service with one of the U.S. wireless carriers (AT&T,

13   Verizon, Sprint, T-Mobile, etc.).

14           10.     Of the 44 million subscribers who disconnect or terminate their wireless telephone

15   service, I estimate based on my experience and knowledge of the wireless industry that approximately

16   half (50%) of those subscribers port or transfer their telephone number ("MDN"[1]) to another carrier,

17   leaving approximately the other half (50%) subscribing to wireless telephone service with a new

18   wireless carrier with a new MDN.  Despite the advent of number portability, there are many reasons

19   why subscribers that terminate their service may abandon their MDN and will not port or transfer their

20   MDN to another carrier.  As the Plaintiff identified in his Complaint, customers may abandon their

21   MDNs if they move to a different area code, change wireless carriers, no longer want their cell phone

22   model, or simply want a different number.

23           11.     ARPU is the Average Revenue Per User or Average Revenue Per Unit.  It is the revenue

24   generate by a customer's wireless telephone per month.  ARPU is calculated by dividing the aggregate

25   amount of revenue by the total number of users who provide that revenue.  The annual revenues

26   _____

27   [1] "MDN" or Mobile Directory Number is the actual phone number one would dial to reach a specific
     mobile phone.  For purposes of this analysis, I assume that one subscriber has one MDN, and I will
28   sometimes use MDN or subscriber interchangeably.

DECLARATION OF ROB MALCOLM

generated by the Premium SMS Content market in the United States is approximately $1 billion ($1,000,000,000) for 2007. If, as discussed above, there are 237 million subscribers in the United States, and there is a 7.7% penetration rate in the U.S. wireless market for Premium SMS Content, that means that approximately 18,249,000 subscribers account for the approximate $1 billion in annual revenues from the Premium SMS Content market. Given these figures, the ARPU is calculated to be about $4.56 per month ($1,000,000,000 ÷ 18,249,000 ÷ 12). This figure represents the average revenue per month earned by the wireless carrier from Premium SMS Content from each subscriber or MDN in 2007.

12.    If 44 million subscribers disconnect or terminate their wireless telephone service each year and fifty percent (50%) of those telephone numbers are not ported or transferred to another carrier, that leaves 22,000,000 MDNs that are available each year to be "recycled" by the wireless carriers. Of these 22,000,000 MDNs that can be "recycled" by the wireless carriers, approximately 7.7% – or 1,694,000 MDNs – were previously enrolled in Premium SMS Content. Thus, approximately 1,694,000 MDNs have the potential to be "recycled" and have been enrolled in Premium SMS Content. This figure represents the number of potential subscribers that could be charged for mobile content services not authorized by the existing owner of the MDN because of a "recycled" MDN.

13.    With an estimated ARPU of $4.56/month for Premium SMS Content, there is the potential that subscribers who have been issued a recycled number could be charged by $46,347,840 per year (1,694,000 x $4.56/month x 6 months = $46,347,840) for mobile content services not authorized by the existing owner. For purposes of this calculation, I have assumed that a subscriber who has been issued a recycled number and has received such charges will be able to stop the charges from occurring within six months – either by calling the wireless carrier or contacting the mobile content provider.

14.    The $46,347,840 figure is across all "aggregators" for all wireless carriers. In order to determine the potential amount of this figure that might be related to mBlox's conduct, this figure has to account for mBlox's one third of the U.S. market share. Because mBlox has only one-third of the market share, 1/3 of the $46,347,840 figure would total approximately $15,449,280 per year ($47,364,240 ÷ 3 = $15,449,280).

15.    If you take into account the number of years in which mBlox has been in the U.S. market

4

1    for Premium SMS Content, that figure increases to $69,521,760.  Even if you assume that mBlox's

2    Premium SMS Content market was $0 in June, 2003 when mBlox entered the market and has increased

3    linearly between June, 2003 to the present, the amount in controversy would still be approximately

4    $34,760,880 ($69,521,760 ÷ 2 = $34,760,880).

5         16.    Based on the figures above relating only to Premium SMS Content, the amount in

6    controversy at issue in this case against mBlox alone is potentially in excess of $5,000,000.

7         17.    Plaintiff has also alleged that he has received unauthorized charges for unsolicited

8    "standard" rate text messages.  In calculating the extent to which wireless subscribers may be subjected

9    to charges for "standard" rate text messages resulting from "recycled" MDNs, the penetration rate for

10   premium services is not relevant because all subscribers who have a "recycled" MDN could received

11   unsolicited standard rate messages resulting from a prior subscriber's authorization.  Similarly, the

12   ARPU is not relevant because this is not a premium service.  Rather, the only figures that are relevant

13   are the total number of "recycled" MDNs (22,000,000), the percentage of those "recycled" MDNs that

14   receive unsolicited standard rate messages (that would incur a "per incoming message" charge of $.05

15   according to Plaintiff's complaint), and the number of unsolicited standard rate messages received by a

16   subscriber with a "recycled" MDN.  Based on my knowledge and experience in the wireless industry, I

17   believe that a conservative estimate of the percentage of "recycled" MDNs that potentially receive

18   unsolicited standard rate messages due to a prior subscribers authorization could be 15% and that a

19   subscriber could receive up to 15 unsolicited standard rate messages before being able to stop the

20   charges from occurring – either through the wireless carrier or the mobile content provider.  Based on

21   these estimates, a subscriber with a "recycled" MDN could potentially be subjected to unauthorized

22   charges for "standard" rate text messages totaling approximately $2,475,000 per year (22,000,000 x .15

23   x 15 x $.05 = $2,475,000).  Again, if you account for mBlox's market share and the number of years in

24   which mBlox has been in the U.S. market, the potential figure could be approximately $3,712,500

25   ($2,475,000 x 4.5 ÷ 3 = $3,712,500).

26        18.    I do not in any way opine or attest that the damages claimed by the Plaintiff against

27   mBlox in the complaint are legitimate or recoverable damages.  I also do not believe that Plaintiff should

28   be able to claim or recover any damages – individually or as a class member – from mBlox, and I do not

5

DECLARATION OF ROB MALCOLM

1    in any way admit or concede that Plaintiff can do so.  I also do not concede that this is a proper method

2    for calculating damages should this case proceed to trial.  Rather, my sole point of view has been to try,

3    using what is pled in Plaintiff's Complaint and the industry data that is currently available (before any

4    discovery has taken place), and solely for the limited purpose of determining amount in controversy, to

5    imagine a plausible method to estimate class-wide damages assuming that Plaintiff's claims were in fact

6    true, including the claims of damage or injury.

7

8    I declare under penalty of perjury under the laws of the United States of America and the State of

9    California that the foregoing is true and correct to the best of my knowledge and belief.  Executed this

10   26th day of November, 2007 in London, United Kingdom.

11

12                                                 /s/ Rob Malcolm

13                                                 ROB MALCOLM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ROB MALCOLM